Ferenc (Franz) Molnar v. Commissioner.
Molnar v. Commissioner
Docket No. 6057.
United States Tax Court
1945 Tax Ct. Memo LEXIS 59; 4 T.C.M. (CCH) 951; T.C.M. (RIA) 45317; October 16, 1945
John J. Sweedler, Esq., 475 Fifth Ave., New York, N. Y., for the petitioner. William F. Evans, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion KERN, Judge: Respondent has determined a deficiency in petitioner's income tax for the year 1941 in the sum of $3,684.71. The two issues presented are (1) whether petitioner is a non-resident alien, and (2) whether certain lump sum payments received by petition, who is an author, from American motion picture companies for certain world rights in and to literary production of petitioner, constituted income from sources within the United States, or were partly from sources within and partly from sources without the United States. [The Facts] The taxpayer is an author by profession and is a citizen of Hungary. From 1931 to 1938 inclusive *60 he was a resident of France, and in 1939 he resided in Switzerland. On January 12, 1940 he arrived in this country on a temporary visitor's visa, traveling from Geneva, SWITZERLAND VIA Genoa, Italy. He purchased a round trip steamship ticket from Genoa to the United States. This temporary visitor's visa was extended from time to time for periods of six months until October 6, 1943, when the taxpayer left this country for Canada and thereafter returned to this country on a permanent visa. On February 19, 1944, the taxpayer filed his notice of intention to become a citizen of the United States. While in this country petitioner lived at the Hotel Plaza in New York City, except for a month or two in the summers, and there carried on his business as an author as hereinafter set forth. On April 17, 1941, taxpayer entered into a written contract in New York City with RKO Radio Pictures, Inc., wherein, for a consideration of $19,750 paid to him, the author assigned to RKO Radio Pictures, Inc. the following rights in and to a certain play as set forth in the contract between the parties: "The Author hereby forever grants, bargains, sells, assigns, transfers and sets over unto the Purchaser *61 all and the sole and exclusive motion picture rights (including silent, sound, dialogue and musical motion picture rights) throughout the world, and all and the sale and exclusive televised motion picture rights, throughout the world, in and to the Property, and in and to each constituent part of the Property." The Contract recites that the taxpayer is sole author of a Hungarian play and of a German adaptation of the original play of which the world motion picture rights were therein assigned, and that the English adaption of the play was first published in the United States of America by Brentano's, and was registered for copyright in the United States Copyright Office in the name of Charles Froman, Inc., formerly a New York corporation, on February 7, 1927, under entry A-967142, said English adaption having previously been registered for copyright as an unpublished dramatic composition on December 24, 1926, under Entry No. D-77,928, in the name of Charles Frohman, Inc., the German adaption likewise having been registered as an unpublished composition, in the United States Copyright Office on May 10, 1926, under Entry No. D-75,392, in the name of Charles Frohman, Inc. The rights *62 acquired by RKO Radio Pictures, Inc., were never exercised and no motion picture was ever produced or exhibited by RKO Radio Pictures, Inc., and these rights are still in the possession of that corporation and may be exercised by it at any time in the future. RKO Radio Pictures, Inc., in its production and leasing of motion pictures, received income from domestic and foreign sources in the following percentages for the following years: Within
Without
Year
the U.S.
the U.S.
1940
66%
34%
1941
65%
35%
1942
69%
31%
On August 26, 1941, the taxpayer assigned to one Boris Morros, a domestic motion picture producer residing in the United States, motion picture rights throughout the world to a short story of which the taxpayer was the author, entitled "The Marshal". The consideration received was the amount of $2,550. This contract, executed by the parties in New York City, provides: "The Author hereby grants and assigns to the purchaser all the motion picture rights, throughout the world, in and to and in connection with the said play, * * * including the right to exhibit by television or any other process of transmission now known or hereafter to be devised *63 and/or to copyright, vend, license and/or exhibit such motion picture photoplays throughout the world." This play was published by Vanguard Press, in a volume of plays in 1929 and registered for copyright in the name of Vanguard Press, Class A No. 10368, on July 12, 1929. The rights sold to Boris Morros were exercised by him in the production of a motion picture entitled "Tales of Manhattan", of which petitioner's play "The Marshal" was a part. The picture "Tales of Manhattan" was produced and distributed by 20th Century Fox Film Corporation in 1942. The income received by the 20th Century Fox Film Corporation in the leasing of the picture, from domestic and foreign sources for the period from the release date of August, 1942, to December 30, 1944, with the exception of the foreign field which is to November, 1944, is as follows: $1,886,741.10 in the United States, and $1,219,646.12 in foreign countries. In 1941 petitioner was a non-resident alien who maintained his place of business in the United States. The entire amount received by petitioner for his rights and interests under the contracts above referred to constituted income to petitioner from sources within the United *64 States. The two foregoing conclusions of ultimate fact in effect resolve the two issues presented. The first issue presents the vexed question of residence under the taxing statutes, which is a concept involving determinatives difficult to formulate into rigid and easily applicable rules. The respondent, in Regulations 103, section 19.211-2, [1] has attempted to formulate such a rule. The most definitely ascertainable test which is referred to therein and the one which is capable of being applied with the greatest certainty, is as follows: An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances. *65 See also I.T. 3386, C.B. 1940-1, p. 66; G.C.M. 4236, C.B. VII-2, p. 131. In the instant case, petitioner's stay in the United States was limited during the taxable year to a definite period by the immigration laws. However respondent contends that there are here "exceptional circumstances" which make the quoted provision of the Regulation inoperative, citing Mim. 5883, June 27, 1945, I.R.B. 1945-13-12081, modifying I.T. 3386. Paragraph 4 of Mim. 5883 is set out in the margin. [2]
*66 We do not question the validity of the modification of I.T. 3386 by Mim. 5883 or of the respondent's position upon the general subject of an alien's residence. However, upon the facts disclosed by the record before us we are of the opinion that no such exceptional circumstances are present as would warrant us in forsaking the certainty afforded by the provisions of the pertinent Regulations to the effect that "an alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident * * *." Here the petitioner testified that he intended, during the taxable year, to stay in this country for only a definite and temporary period; he traveled to this country on a round trip steamship ticket; lived in this country at a hotel; he is not shown to have entered into any regular employment or to have engaged in any business transactions other than the two set forth in our findings; and his daughter, his only family connection, remained in Europe. Accordingly, we have held that petitioner, during the taxable year, was a non-resident alien within the meaning of the Revenue Act. With regard to the second issue we have followed our decision in Estate of Alexander Marton, 47 B.T.A. 184. *67 The contracts in the instant case were executed in the United States, the moneys in question were paid to the petitioner in the United States by American corporations from their corporate funds in lump sums. No segregation of these sums was made by the parties with regard to the various rights which petitioner might have had under the copyright laws of individual nations or pursuant to international convention, or with regard to the situs of the eventual use of these rights by the American corporations. Nor was such use a contingency by which the amount of payment was in any way measured or upon which the payment itself in any way depended. Whatever rights petitioner had were assigned to the American corporations who could then produce under these rights, or not produce as they saw fit, and could exhibit any production in any country they chose, or exclusively in the United States. We do not know what part of the lump sum payments were made for any of the several rights which made up the whole assigned by petitioner, nor do we know the several regions in which the American corporations contemplated, at the time of the transactions, to exhibit, and thus effect an ultimate recoupment *68 of the amounts paid to petitioner. We can see nothing but confusion and uncertainty which could result from our deviating from our decision in the Marton case, supra. Decision will be entered under Rule 50. Footnotes
1. Sec. 19.211-2. Definition. - A "nonresident alien individual" means an individual - (a) Whose residence is not within the United States; and (b) Who is not a citizen of the United States. The term includes a nonresident alien fiduciary. An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another county is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.↩
2. Mim. 5883 * * * 4. Attention is invited to the last sentence of section 29.211-2, Regulations 111, which states that an alien whose stay in the United States is limited to a definite period by immigration laws is not a resident of the United States within the meaning of that section, in the absence of exceptional circumstances. The general rule adopted by the Bureau is that the type of visa issued is only one of elements entering into the classification of the alien as a resident or nonresident It is believed that there are many cases now which will come under the phrase "in the absence of exceptional circumstances" because of the fact that many visitors' permits, or temporary visas, were issued to aliens who desired merely to get out of the war-torn country under any conditions and under any passport or visa so long as they reached the shores of the United States. For example, while the vast majority of such aliens originally entered the United States on temporary permits, numerous extensions of such permits have been applied for and granted and a great number of applications have been made by such aliens to enter a third country in order to qualify for re-entry to the United States on immigrants' visas, thus indicating an intention to become residents of the United States even though such immigrants' visas may not have been granted. On the other hand the possession of an immigrant's visa by an alien, upon his initial entrance into the United States, is not conclusive of his classification as a resident of this country. * * *↩